UNITED STATES DISTRICT COURT
DISTRICT FOR MARYLAND, GREENBELT, MARYLAND

| | |
|---|---|
| Dr. Olusegun E. Akinjide<br>9923 Greenbelt Road, #204<br>Lanham, MD 20706<br><br>Plaintiff<br><br>v.<br><br>University of Maryland Eastern Shore<br>Administration Building<br>Princess Anne, MD 21853-1299<br><br>Dr. Ronnie Holden<br>UMES<br>Administration Building<br>Princess Anne, MD 21853-1299<br><br>Leon Bivens, Director Physical Plant<br>UMES<br>Backbone Road,<br>Princess Anne, MD 21853-1299<br><br>Defendants. | Civil Action No.<br><br>Jury Trial Demanded |

COMPLAINT
Race/Color, National Origin; Equal Pay and Compensation,
<u>Non Selection, Discrimination in Employment, and Federal Fair Labor Standards Act</u>

INTRODUCTION

1.   Dr. Olusegun E. Akinjide (hereinafter "Dr. Akinjide or Plaintiff") brings this civil action pursuant to the Civil Rights Act of 1964 as amended, 42 USC. Section 2000e, ("Title VII"); the Civil Rights Act of 1866, as amended 42 U.S.C. §1981 ("Section 1981"); Federal Fair Labor Standards Act, and Maryland Common Law. Dr. Akinjide asserts that because of his race (African), color (black), national origin (Nigerian), he was discriminated by Defendants. When

1

Defendants discriminated against him, and he filed a complaint, Defendants retaliated against him in violation of law. Plaintiff also asserts that Defendants underpaid him, overworked him as compared to other American employees whom he trained, and who were later selected to higher positions over him. Plaintiff further asserts that Defendants through Dr Ronnie Holden, denied him promotion, pay raise, continually threatened, harassed and denied him positions that he was qualified for.

## JURISDICTION

2.  This Court has jurisdiction over the subject matter of this civil action pursuant to 28 U S C Section 1331. This action is authorized and instituted pursuant to Section 706(f) of Title VII, 42 U.S.C. § 200e-5(f); and 42 U.S.C. § 1981 as amended. Dr. Akinjide timely files this complaint after exhausting his administrative remedies at the Equal Employment Opportunity Commission ("EEOC"), pursuant to EEOC regulations at 29 C.FR. Section 1614.

## VENUE

3.  Venue is proper in this judicial district because Plaintiff was employed by Defendant in Maryland, and all events that give rise to this claim took place in this jurisdiction.

## PARTIES

4.  Dr. Akinjide is a resident of Maryland, a United States citizen and a native of Nigeria. During the relevant periods of acts in this complaint, Plaintiff was employed by the University of Maryland, Eastern Shore.

5.  Defendant University of Maryland Eastern Shore, (hereinafter "UMES") is a State owned University, with campuses all over the State of Maryland. Dr. Ronnie Holden (hereinafter "Holden"), is the Vice President for Administrative Affairs, he also claims to be the

president, is responsible for its personnel actions and practices. Mr. Leon Bivens is the Director of Physical Plant.

## STATEMENT OF FACTS

6. In 1984, Dr Akinjide, received a BS Degree in Electrical Engineering from Tuskegee University, Alabama; and a Master's Degree in 1986, in Electrical Engineering from the same University. In 1992, he obtained a certification in Engineer-In-Training (EIT). In 2000, he obtained a Master's Degree in Applied Computer Science from the UMES, and a Ph.D., in Organizational Leadership from the University of Maryland Eastern Shore in 2006.

7. In 2002, Dr. Akinjide obtained a certification in Professional Engineer (P.E.) in the State of Maryland. Dr. Akinjide has a combined 20 years of experiences in Manufacturing Processes, Cost Estimating, Designing, Electrical Installation Plan and Electrical Engineering.

8. Before his employment at the University of Maryland Eastern Shore in 1990, Plaintiff worked at Cutler-Hammer/Eaton in Georgia, as a Quality Control Officer from 1988 through 1990. While at Tuskegee, Dr. Akinjide taught Electrical Engineering courses as a graduate Student from 1984 through 1986. Between 1990 and 1992, he taught a course titled Introduction to Engineering at the University of Maryland Eastern Shore. From 2003 through 2005, Plaintiff taught weekend courses at Dover Air Force Base, Dover, Delaware, in Manufacturing Processes and Quality Control.

9. Dr. Akinjide joined UMES in 1990 as an Engineer III, with a starting salary of $31,000. In 1992, Dr. Akinjide passed the Engineer-In-Training (EIT) examination and became certified.

10. On or about June 1992, following the certification, Dr. Akinjide applied and

requested for promotion and pay raise but was denied. In or about 1990, in comparison, the following co-workers earned the salaries listed against their names:

    Mr. Ngwaba (Architect) $29,000;

    Mr. Mohanjeet Kholi (Mechanical Engineer) $30,000;

    Mr. James Lunnermon (maintenance supervisor) $26,000;

    Elisha Jones (supervisor); Mark Clauss (Landscape supervisor); Mr. Bruce Williams (mechanical and electrical supervisor) $27,000 and

    Mr. Leon Bivens (uncertified electrician) without college degree was paid, $24,000.

11.    Mr. Bruce Williams was the HVAC/electrical maintenance supervisor for Mr. Leon Bivens. As Engineer III, Plaintiff supervised Mr. Bruce Williams. Between 1993 and 1994, Mr. Bivens was appointed electrical shop supervisor by Dr Holden.

**12.**    In 1991, the UMES instituted a Computerized Maintenance and Work Order System (Applied Computer Technology – ACT1000) and Mr. James Lunnermon became the Work Order Specialist in 1993. Plaintiff trained all Physical Plant personnel including those in Facilities Planning & Engineering, and Operations. Trainees included Mr. James Lunnermon from 1991 until he was made Work Order Specialist in 1993. Plaintiff administered ACT 1000 and ran the ACT1000 productive work report weekly for thirteen (13) years until 2004.

13.    Between 1992 and 1995, Plaintiff did not receive any Cost of Living Adjustment to his salary until 1995 when the newly appointed Director, Dr. Anderson awarded him Cost of Living Adjustment, which had been previously denied by Dr. Holden.

14.    Meanwhile between 1992 and 1995, Plaintiff's colleague's salaries were significantly increased; Mr. Mohanjeet Kholi's salary increased from $30,000 to $45,000; and Mr.

Ngwaba's salary increased from $29,000 to $42,000. However, Dr. Holden refused to increase Plaintiff's, which remained at about $35,000.

15. Between 1993 and 1996, Mr. Bivens a subordinate was twice appointed to two higher positions that were neither advertised nor posted by Dr. Holden. In 1993, Mr. Leon Bivens was appointed a Supervisor of (Electrical Shop Supervisor); even though, he was not a certified electrician. In or about 1996, he was again appointed an Assistant Director of the Physical Plant without his electrician certification or college degree by Dr. Holden.

16. Apart from the fact that Mr. Bivens did not have a college degree, many employees in the Physical Plant were more qualified and with more experience but he was given the position because of his personal relationship with Dr. Holden.

17. To appoint Mr. Bivens as Assistant Director, Dr. Holden removed Bruce Williams and asked Bruce Williams to join the Facilities, Planning and Engineering Department that reported directly to the Vice President of Administrative Affairs (Dr. Holden). After Mr. Leon Bivens was confirmed, Dr. Holden recombined the two departments (Facilities, Planning & Engineering and the Operations), and denied Plaintiff salary increase and promotion.

18. In 1996, Dr Holden appointed Mr. Lunnermon, his friend and business partner, Director of the Physical Plant. Whereas, Plaintiff, Mr. Maurice Ngwaba and Mr. Mohanjeet Kholi were more qualified for the position which was never advertised. Dr. Holden appointed Lunnermon to the position because he was his business partner and they were buying, building, and selling homes and other real estate together.

19. Between 1995 and 1996, the Physical Plant personnel, Mr. Ngwaba; Peter Okemmuo; Mr. Mohanjeet Kholi and Plaintiff complained to Dr. Holden that Mr. Leon Bivens and

Mr. James Lunnermon, who were appointed to positions of Assistant Director and Director of Physical Plant were less qualified than they were. In response, Dr. Holden, restructured the physical Plant into Facilities and Operations and placed Engineering staff into Facilities. Furthermore, Dr. Holden appointed Mr. Ngwaba an Interim Assistant Director for Facilities. Dr. Holden also promised to do something about the remaining staff (Plaintiff and Mr. Kholi), especially increase and adjustment of their salaries by 1998. Dr. Holden did not fulfill this promise to Plaintiff but instead, substantially increased the salaries of Mr. Leon Biven's and Mr. James Lunnermon who were his friends and business partners, to the detriment of Plaintiff.

20. Between 1997 and 1998, Dr. Ronnie Holden recombined the engineering and the operations sections of the Physical Plant in yet another restructuring. Plaintiff was classified as a Senior Electrical Engineer, however, during the restructuring of Physical Plant between 1999 and 2000, Plaintiff was reclassified as a Construction Electrical Engineer, which did not match any position title in the University System of Maryland.

21. In 2000, Plaintiff earned another Master's Degree in Applied Computer Science and requested for a promotion and a salary increase. Both requests were denied by Dr. Holden.

22. Between 2001 and January 2002, the Mechanical Engineer in the Physical Plant died and his responsibilities including his projects were transferred to Plaintiff by Dr. Holden. Between March and June 2002, Mr. Ngwaba and Plaintiff met with Dr. Holden to initiate arrangements to hire the replacement to the Mechanical Engineer. Plaintiff was assigned the responsibility to prepare the job description and the personnel requisition along with the job announcement and advertisement. However both the requisition and advertisement which was given

to Dr. Holden mysteriously disappeared, and he never assigned an account number for the position to be advertised.

23. The duties and responsibilities of mechanical engineer was transferred to Plaintiff by Dr. Holden, which included his responsibilities as the Construction Electrical Engineer, with no salary increase.

24. In 2002, Plaintiff passed the Professional Engineering Licensing (P.E.) Examination, began his studies in Organizational Leadership to earn a Ph.D., and requested for a promotion and a salary increase but was denied by Dr. Holden.

25. In 2002, other members of staff of the Physical Plant complained about the unfilled position of Mechanical Engineer and an Energy Manager and urged Dr. Holden to fill the positions.

26. Finally between 2003 and 2004, the position of Mechanical Engineer was eventually advertised. Although there were applicants, Dr. Holden did not permit any interviews, because according to him there were not enough candidates. No one was hired, because it was a pretext for him to continue to punish and retaliate against Plaintiff by forcing Plaintiff to perform his duties as Construction Electrical Engineer, plus the duties of Energy Manager and the duties of the mechanical engineer, without any increase in salary or promotion.

27. In 2003, still without a college degree, Mr. Bivens was appointed an Associate Director of Physical Plant by Dr. Holden. In 2004, Mr. Bivens obtained a B.A. degree in General Studies , a field unrelated to the Physical Plant or Engineering.

28. In 2004, Mr. Maurice Ngwaba was appointed the Interim Director of the Physical Plant, and Plaintiff was appointed Interim Assistant Director in Physical Plant with a $1200 increase in my salary, which was a cover up because of Plaintiff's complaints. Mr. Leon Bivens, who did not

have a college degree at the time, was appointed Associate Director with a significant salary increase by Dr. Holden.

29. Between 2005 and 2006, Dr Ngwaba appointed Plaintiff to Chair the Search Committee for the Mechanical Engineer. Finally interviews were conducted to fill the position; five candidates were interviewed and three were recommended by the Committee, but none was hired by Dr. Holden. Meanwhile Plaintiff continued to do the work of the Construction Electrical Engineer, plus the duties of Energy Manager Mechanical Engineer without additional compensation by Dr. Holden.

30. In 2005, 2006 and 2007, Plaintiff requested that his designation be changed from Interim Assistant Director to Assistant Director with salary increase because of his additional responsibilities, experience and qualifications but Dr. Holden denied all the requests. Denial of Plaintiff's request for promotion, salary increase and change in designation was a violation of the University System of Maryland (USM) policy, which stipulates that Interim Positions can only be held for 2-years. Plaintiff held the interim position for 5 years.

31. In October 2007, Dr Akinjide met with Dr. Holden to discuss the overwhelming job responsibilities, including my interim position, Construction Electrical Engineer and the duties of the Mechanical Engineer and Energy Manager placed on him. Plaintiff reminded Dr. Holden of the USM Policy and also informed him that he could no longer perform the duties of the Mechanical Engineer in addition to that of the Electrical Engineer, and Energy Manager without a pay increase, and also because of the health problems associated with doing the work of three employees. Dr. Holden told Plaintiff "the job you are doing is not enough", insinuating that he was going to add additional responsibilities to Plaintiff.

32. Plaintiff then informed Dr. Holden that he was under doctors care because of the extreme fatigue and depression due to the multiple responsibilities at UMES. Dr. Holden told Dr. Akinjide that he will be assigned more work

33. In 2008, Dr Akinjide continued to apply and repeated his 2002-2007 requests to Dr. Holden, to change his title, reduce the work responsibilities, promote and increase Plaintiff's salary, commensurate with his responsibilities. Dr. Holden told Plaintiff that there is no money to increase his salary whereas Dr. Holden promoted and increased the salaries of others like Mr. Bivens. When Dr Akinjide inquired on why Bivens salary and position has been changed and increased on many occasions, Dr. Holden threatened "Bivens promotion is none of your business."

34. Between January and February 2008, in a Physical Plant meeting conducted by Dr. Maurice Ngwaba, the then Physical Plant Director, Plaintiff repeated his complaints of 2002-2008 and informed Dr. Ngwaba that he would no longer be able to combine the duties of the Electrical Engineer, Mechanical Engineer and Energy Manager, at his current salary. Plaintiff further informed Dr. Nwaba that he will be unable to perform the additional duties of Mechanical Engineer and Energy Representative if those positions were not filed July 1, 2008. Dr. Ngwaba promised to present the problem to Dr. Holden, and he did.

35. Dr. Holden authorized Dr. Ngwaba to advise Plaintiff to prepare another requisition and job description which Plaintiff did. Once again the position was never advertised because Dr. Holden had already told Plaintiff that the three position duties he performed was not even enough. This was in retaliation for Dr. Akinjide complaining about Dr. Holden's business partners and friends being promoted.

36. In June 2008, Dr. Holden appointed Mr. Bivens to be the Director of Physical Plant

with a large salary increase. He also deliberately made Mr. Bivens, Dr Akinjide's supervisor even though Mr. Bivens did not have any technical qualifications, experience or expertise for the job, in retaliation for Plaintiff's complaints.

37.     At the authority of Dr. Holden, Mr. Bivens have intimidated, harassed, and bullied Plaintiff at the behest of Dr. Holden, after he was made Plaintiff's supervisor.

38.     Between 2007 and 2008, InfraRed Testing Inc., from Chicago, used thermo scanner (Infrared) to inspect UMES facilities and discovered several deficiencies. The Director of Physical Plant, Dr. Maurice Ngwaba, directed the Operations Department to correct the deficiencies. This was the duty of Mr. Bivens and his Operations Department but because he had no qualification or the experience to perform the job, the deficiencies were not corrected. The deficiencies were not corrected for more than nine (9) months beginning in April 2007. Because of the potential liability to UMES and the State of Maryland, in or about June 2008, Dr. Ngwaba directed that Plaintiff correct the deficiencies and forward a report to Traveler Insurance since Mr. Bivens was incompetent to correct the deficiencies. This was an additional work added to my already overworked schedule due to Dr. Holden retaining and promoting Mr. Bivens to a position that he neither had the qualifications or experience to perform.

39.     Based on the above, Plaintiff elicited the help of the Physical Plant Electrician, Mr. Donald Ballard and others. While carrying out the inspection and repairs, Mr. Bivens came to the site after hearing conversation about the project on the walkie-talkie. Mr. Bivens insulted and berated Plaintiff. Mr. Bivens further told Plaintiff "one down and one more to go" meaning that Dr. Nwaba had been demoted, and Plaintiff was next. He then ordered all personnel assisting Plaintiff on the project to leave. Mr. Bivens then ordered Plaintiff to find other means

to complete fixing the deficiencies. Mr. Bivens said that he was the Biblical Pharaoh ordering the Israelites to make bricks without straw. Plaintiff would have reported the matter to Dr. Nwaba, but at that time, Dr. Nwaba had been demoted from Director of Physical Planning. Plaintiff had to call an outside company, Electrico Inc., which he supervised to repair the deficiencies. When Plaintiff reported the incident to Dr. Holden, he supported Mr. Bivens.

40. From 2002, Plaintiff was the Project Manager on Electrical Improvement. In 2008 a contractor violated the electrical installation code. Around June and July 2008, at the UMES Clusters Residential Building, the contractor damaged a transformer and the mineral oil leaked out of the transformer. Plaintiff directed the Contractor to test the transformer after repairs. The Contractor made repairs and informed the UMES to restore power without testing the transformer as I directed.

41. Mr. Bivens ordered the Contractor to restore power without testing the transformer, and Plaintiff informed Mr. Bivens that it was against electrical code. The Contractor agreed and informed Mr. Bivens that they will not restore power without approval form Plaintiff. Mr. Bivens came to the site several times with an intention to disrupt the progress of the project. He continually told his maintenance personnel that Plaintiff did not know what he was doing. Mr. Bivens disrupted, harassed and intimidated Plaintiff continuously on the job site. Mr. Bivens continuously, in a loud voice shouted at Plaintiff that Bivens was Plaintiff's boss and Plaintiff must follow his instructions, even though such instructions were a violation of the electrical code. The contractor eventually tested the transformer, and it failed. If the power was restored as ordered by Mr. Bivens, this transformer would have caused severe injuries and damages to both personnel and the physical facilities.

42. On August 5, 2008, Plaintiff was on duty until about 6:00 p.m. Plaintiff was told by the Contractor and the Field Inspector that a new transformer was on the way to the University. Nevertheless, the transformer did not arrive on Thursday August 5, 2008. On Friday August 6, 2008, Plaintiff was extremely sick and could not return to work until Monday August 11, 2008. On August 11, 2008, Mr. Bivens came to Plaintiff's office around 9:00 a.m., and ordered that Plaintiff turn over to him the test result performed on the new transformer. When Plaintiff told Mr. Bivens that he had not received any test report from either the Contractor or the University of Maryland College Park. Mr. Bivens threatened, bullied, harassed, and insulted Plaintiff in the presence of other staff. Mr. Bivens told Plaintiff "if you don't turn over the test report to me I will show you who the boss is around here." He latter interfered with the contractors, and collected the test result and forwarded it to Plaintiff with an insult.

43. Plaintiff reported the mistreatment, harassment, intimidation, the unhealthy and hostile work environment that Mr. Bivens was creating to Dr. Holden, but he supported Mr. Bivens. Under this circumstances, Plaintiff's Physician advised Plaintiff to resign to save his health and sanity, because it was clear Dr. Holden wanted to get ride of him.

44. Dr. Holden discriminated and retaliated against Plaintiff by underpaying, threatening, harassing, denying promotions, and appointments. When Plaintiff continued to complain to Dr. Holden, he ordered Plaintiff to leave to leave if Plaintiff did not like what Dr Holden was doing. . On August 18, with humiliation and failing health, Plaintiff resigned his appointment.

45. This decisions by Holden was clear retaliation against Dr. Akinjide for seeking his right to equal pay and promotion and by filing a complaint against Dr. Holden. Defendant through Dr. Holden, denied Dr. Akinjide's promotion and equal pay because of his race, and

national origin, and retaliated against Dr. Akinjide because he complained against him.

46. Due to Defendants continuous race/color; national origin, discrimination, equal pay and compensation discrimination and non selection discrimination in employment against Plaintiff, plaintiff filed a complaint with the EEOC.

## STATEMENT OF CLAIM

47. The plaintiff was subjected to intentional and willful discrimination, retaliation, hostile work environment because of his Race/Color; and National Origin; and denied promotion and equal pay until his resignation in 2008, in total disregard to Defendants employee policy requirements. The Defendants engaged in unlawful employment practices in violation of Title VII.

48. The plaintiff was subjected to intentional and willful discrimination because Defendant paid him less wages than other counterparts and denied Plaintiff promotions.

49. Plaintiff suffered economic losses, lost pay benefits, lost wages, lost career benefits and opportunities, emotional distress, and. personal and professional humiliation because of Defendants unlawful discrimination practices.

## FIRST CAUSE OF ACTION
## TITLE V11 - FAILURE TO PROMOTE

50. Plaintiff repeats and realleges each of the allegations contained in paragraphs 1 through 50 above as though fully set forth herein.

51. Plaintiff is a member of a protected class, African, Nigerian.

52. Plaintiff possesses all of the qualifications and skills necessary to be promoted to the positions he applied for until 2008.

53. Plaintiff was better qualified than other individuals who were promoted.

54.     Plaintiff applied for promotion but was not promoted because of his race, and national origin.

55.     Defendants' failure to promote Plaintiff was an act of discrimination in violation of Title VII, 42 U.S.C. § 2000e-2(a).

56.     Defendants failure to promote plaintiff was willful and malicious and was done with reckless indifference to plaintiff's right to employment opportunities unfettered by racial discrimination guaranteed to him by Title VII, 42 U.S.C. § 2000e-2(a).

## SECOND CAUSE OF ACTION
## TITLE VII - RETALIATION

57.     Plaintiff repeats and realleges each of the allegations contained in paragraphs 1 through 57 above as though fully set forth herein.

58.     Also from 1992 thru 2008 after Plaintiff filed his charges of discrimination and unfair employment practices against the Defendants, Defendant escalated its deliberate retaliatory actions; including promoting a subordinate, with less qualification to be Plaintiff's boss. Authorizing Mr. Bivens to harass, threaten and order Plaintiff around.

59.     All of these actions by Defendants were willful and malicious and taken in direct and knowing violation of Title VII, 42 U.S.C. § 2000e-2(a)

## THIRD CAUSE OF ACTION
## SECTION 1981 - FAILURE TO PROMOTE

60.     Plaintiff repeats and realleges each of the allegations contained in paragraphs 1 through 60 above as though fully set forth herein.

61.     Plaintiff is a member of a protected class, Black African, Nigerian.

62.     Plaintiff possesses all of the qualifications and skills necessary to be promoted to the position of Assistance Director for Facilities Plaining and Engineering from 2006.

Case 8:09-cv-02595-DKC   Document 1   Filed 10/02/2009   Page 15 of 18

63. Plaintiff was better qualified than the individuals who were promoted.

64. Plaintiff applied to be promoted but was not because of his race, national origin.

65. Defendants failure to promote Plaintiff was an act of discrimination in violation of Section 1981.

66. Defendants failure to promote Plaintiff was willful and malicious and was done with reckless indifference to Plaintiff's rights to employment opportunities unfettered by racial discrimination guaranteed to him by Section 1981.

### FOURTH CAUSE OF ACTION
### SECTION 1981 - RETALIATION

67. Plaintiff repeats and realleges each of the allegations contained in paragraphs 1 through 67 above as though fully set forth herein.

68. Also from 1992 thru 2008 after Plaintiff made his charges of discrimination and unfair employment practices against Defendants, Defendants escalated their deliberate retaliatory actions; including downgrading Plaintiff title, and eventually denying his promotion and salary increase through 2008.

69. All of these actions by Defendant were willful and malicious and taken in direct and knowing violation of the rights guaranteed by Section 1981.

### FIFTH CAUSE OF ACTION
### EQUAL PAY AND WAGE
### TITLE IV AND SECTION 1981

70. Plaintiff repeats and realleges each of the allegations contained in paragraphs 1 through 70 above as though fully set forth herein.

71. After Plaintiff requested the proper wage for his position and job responsibilities,

Defendants continued to pay Plaintiff improper and incorrect wages.

72. Defendants failure to pay Plaintiff her rightful wages was an act of discrimination in violation of Title VII and of Section 1981.

73. Defendants failure to pay Plaintiff his rightful wages was willful and malicious and was done with reckless indifference to Plaintiff's rights to employment opportunities unfettered by racial discrimination guaranteed to her by Title VII and Section 1981.

### FEDERAL FAIR LABOR STANDARDS ACT

74. Plaintiff repeats and realleges each of the allegations contained in paragraph 1 through 74 above as though fully set forth herein.

75. Defendant's failure to compensate Plaintiff rightful wages and salary, entitles plaintiff to triple damages under the Federal Fair Labor Standards Acts.

### Prayer for Relief

Wherefore, Plaintiff respectfully requests that this Court enter judgment in his favor and against Defendants on the above claims and provide him with the following relief:

I. enter a finding that Defendants discriminated against Plaintiff when he was not promoted on the bases of race, national origin in violation of Title VII of the Civil Rights Act of 1964, as amended; and Section 1981.

II. enter a finding that Defendants discriminated against Plaintiff when Defendants failed to change his job title;

III. enter a finding that Defendants discriminated against Plaintiff when he was not paid equal wages with his colleagues in similar positions and denied other benefits associated

with the proper title and pay in violation of Title VII of the Civil Rights Act of 1964, as amended; and Section 1981.

IV.   enter a finding that Defendants discrimination against Plaintiff was intentional and willful, and enjoin Defendants from discriminating or retaliating against Plaintiff and other Africans and Nigerians in the future;

V.   order Defendants to provide Plaintiff with full back pay at the Assistant Director for Facilities Plaining and Engineering position from 2006 (including awards, bonuses, pay raises and increases, 401(k) plan contributions and all other requisite benefits) with interest;

VI.   award liquidated damages in amount equal to the total award of back pay;

VII.   order Defendants to correct Plaintiff's official personnel file and any and all UMES records to reflect the retroactive promotion and back pay award;

VIII.   award Plaintiff the cost of bringing and maintaining this civil action and the administrative charge that preceded it, including reasonable attorneys' fees; and

X.   award Plaintiff triple damages, and such other and further relief as the Court deems just and proper.

XI.   Award Plaintiff punitive damages.

DEMAND FOR A TRIAL BY JURY

Pursuant to Rule 38(b) of the Federal rules of Civil Procedure, Plaintiff demands a trial by jury on all claims.

Respectfully submitted,

-S-

_____
Rev. Uduak James Ubom, Esq, Bar No. 13936
Ubom Law Group, PLLC
7600 Georgia Ave. NW., Suite 411
Washington, D.C. 20012
Tel. (202) 723-8900
Fax (202) 723-5790

CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on October 2, 2009, I caused a true and accurate copy of the forgoing Complaint to be served, by First Class United States Postal Mail, Postage prepaid to: UMES, Dr. Ronnie Holden, Administration Building, Princess Anne, MD 21853-1299 and Maryland State Attorney General.

-S-

_____
Rev. Uduak James Ubom, Esq.