IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

OLUGESUN E. AKINJIDE

      v.                       :  Civil Action No. DKC 09-2595

UNIVERSITY OF MARYLAND EASTERN
SHORE, et al.               :

**MEMORANDUM OPINION**

Presently pending and ready for resolution in this employment discrimination action is an unopposed motion for summary judgment filed by Defendants University of Maryland Eastern Shore ("UMES"), Dr. Ronnie Holden, and Mr. Leon Bivens. (ECF No. 22). The relevant issues have been briefed, and the court now rules pursuant to Local Rule 105.6, no hearing being deemed necessary. For the reasons that follow, Defendants' motion will be granted.

## I. Background

### A. Factual Background

For purposes of this decision, the following facts are uncontroverted unless otherwise stated.

In 1990, Plaintiff Olugesun Akinjide, a black male born in Nigeria and subsequently naturalized as an American citizen, started his career at UMES as an engineer in the Physical Plant

with a salary of $31,000.  (ECF No. 22-4, at 4).[1]  At that time,
he held a bachelor's degree in electrical engineering from
Tuskegee University.  (*Id.*).  Plaintiff alleges that Dr. Holden
- an African-American male, Vice President of Administrative
Affairs at UMES, and the person primarily responsible for its
personnel actions - denied him salary increases from 1992 to
1995, even though several other employees, such as Dr. Maurice
Ngwaba - a Nigerian male who, like Plaintiff, later became an
American citizen - received raises during this time.  (*Id.* at 5;
ECF No. 22-1, at 20).  Dr. Holden asserts that Plaintiff did not
receive salary increases from 1991 to 1993 due to a coding error
in the payroll department's internal system.  (ECF No. 22-8,
Holden Decl., ¶ 8).[2]  From 1993 to 1996, Mr. Bivens and Mr.
Lunnermon, both African-American males employed by UMES,
received promotions and salary increases even though Plaintiff's

---

[1] Plaintiff presents a statement of facts in his complaint
(ECF No. 1), which mirrors the facts set forth in a sworn
declaration attached to the charge of discrimination that he
filed with the Equal Employment Opportunity Commission ("EEOC")
(ECF No. 22-4).  Defendants have included this sworn declaration
in the record.  Because the facts alleged therein were submitted
in the form of a sworn declaration, they have evidentiary value
and may be considered in resolving the present motion.

[2] He additionally maintains that Plaintiff received pay
raises in all other years during which he was employed by UMES
except 2003 and 2004, when a budget crisis prevented any
employees from receiving cost of living adjustments and merit
increases.  (*Id.* ¶¶ 6, 8).

promotion and pay raise requests during this period were denied. (ECF No. 22-4, at 5-6; ECF No. 22-1, at 20; ECF No. 22-9, Holden Dep., at 72).

The Physical Plant personnel, including Plaintiff, complained about these promotions to Dr. Holden, and they were subsequently restructured into two groups in 1997: (1) Facilities and Operations, headed by Dr. Ngwaba, and (2) Physical Plant, headed by Mr. Lunnermon. (ECF No. 22-4, at 6-7). All engineering staff reported to Dr. Ngwaba. (*Id.* at 7). The restructuring was not long-lived; less than two years later, all Plant personnel were recombined, and Plaintiff's title was changed from Senior Engineer to Construction Electrical Engineer. (*Id.*). When Plaintiff earned a Master's degree in 2000, he requested both a promotion and a salary increase, but Dr. Holden denied this request. (*Id.*). The following year, Plaintiff had to absorb additional job responsibilities, without a change in title or pay, when UMES's mechanical engineer died suddenly. (*Id.*). Although UMES eventually advertised the mechanical engineer position in 2003 and 2004, Dr. Holden decided not to conduct interviews because there were not enough candidates, and Plaintiff continued to perform these additional duties. (*Id.* at 7-8).

Around Mr. Lunnermon's retirement in 2004, Dr. Holden promoted Dr. Ngwaba, Mr. Bivens, and Plaintiff. Dr. Ngwaba became Director of Physical Plant, while Mr. Bivens became its Associate Director and Plaintiff its Interim Assistant Director. (*Id.* at 8; ECF No. 22-9, at 49). Plaintiff received a merit increase of $1,200 for assuming this position, while Mr. Bivens allegedly received a significantly greater increase. (ECF No. 22-4, at 8). Plaintiff continued to perform the functions of mechanical engineer as part of his role as Interim Assistant Director. (*Id.* at 8-9). An external committee held interviews for the mechanical engineer position from 2005 to 2006, but Dr. Holden ultimately declined to hire any of the candidates recommended by the committee. (*Id.* at 8).

From 2005 to 2008, after earning a doctorate degree, Plaintiff requested that Dr. Holden promote him by making permanent his interim appointment to Assistant Director, but Dr. Holden denied this request. (*Id.* at 8-9). Plaintiff contends that Mr. Bivens and unspecified "others like Mr. Bivens" did receive promotions and accompanying pay raises during this time. (*Id.* at 9). Plaintiff asserts that these repeated denials violated UMES policy, which permits an employee to hold an interim position for only two years. (*Id.*). Plaintiff found himself overwhelmed by his job responsibilities in October 2007

4

and met with Dr. Holden to discuss a pay raise or workload reduction, but Dr. Holden denied these requests. (*Id.* at 9). Around this time, Plaintiff sought medical care for fatigue and depression that he was experiencing due to his multiple responsibilities at UMES. (*Id.*).

At a Physical Plant meeting early in 2008, Plaintiff informed Dr. Ngwaba that he could no longer perform his current job responsibilities without another pay increase. (*Id.* at 10). Dr. Ngwaba reported this complaint to Dr. Holden, but Dr. Holden took no action. (*Id.*). In June 2008, Dr. Holden transferred Dr. Ngwaba to the position of Assistant to the Vice President for Administrative Affairs and Director of Planning, Facilities, and Construction (ECF No. 22-8 ¶ 11), a move characterized by Plaintiff as a demotion and by Dr. Holden as a promotion (ECF No. 22-4, at 8; ECF No. 22-8 ¶ 11). Dr. Holden then selected Mr. Bivens as Director of Physical Plant. (ECF No. 22-4, at 10).

Before his transfer, Dr. Ngwaba instructed the Operations Department to correct certain deficiencies in UMES's facilities that had been identified by a thermal scan. (ECF No. 22-4, at 10). Plaintiff worked to repair the deficiencies following the transfer and, in June or July 2008, he had a dispute with Mr. Bivens about his handling of the deficiencies. (*Id.* at 11).

According to Plaintiff, Mr. Bivens came to his work site, described himself as the "Biblical Pharaoh ordering the Israelites to make bricks with no straw," and instructed Plaintiff to find a way to repair the deficiencies that did not require assistance from other UMES personnel. (*Id.*). Mr. Bivens also allegedly stated "one down and one more to go," in an apparent reference to the fact that Dr. Ngwaba had been transferred. (*Id.*). Plaintiff contacted an outside company to repair the deficiencies and reported the incident to Dr. Holden, who "supported Mr. Bivens." (*Id.*).

A second dispute arose between Plaintiff and Mr. Bivens in early August 2008. When a UMES transformer lost power, Mr. Bivens ordered a contractor to restore the transformer's power immediately, even though, according to Plaintiff, doing so would have injured both UMES personnel and facilities. (*Id.* ¶ 41). The transformer failed, and a new transformer was ordered and scheduled for delivery on August 5, 2008. (*Id.* at 11-12). The new transformer could not be tested until August 11, 2008, and Mr. Bivens came to Plaintiff's office that morning to demand the test report. (*Id.* at 12). Plaintiff alleges that Mr. Bivens "threatened, bullied, harassed, and insulted" him in front of other UMES staff, told him to "turn over the test report . . . [or Mr. Bivens would] show [Plaintiff] who the boss [was]," and

sent him an insulting email. (*Id.*). Plaintiff allegedly reported this dispute to Dr. Holden, describing Mr. Bivens's actions as "mistreatment, harassment, intimidation, [and an] unhealthy and hostile work environment," but Dr. Holden once again "supported Mr. Bivens." (*Id.*). Dr. Holden maintains that Plaintiff never complained to him regarding any form of discrimination during his employment at UMES. (ECF No. 22-8 ¶ 18).[3]

Plaintiff submitted his resignation on August 18, 2008, and took leave most of the following two weeks. (ECF No. 22-12). Plaintiff resigned his employment with UMES on September 2, 2008. (*Id.*). At that time, he was earning an annual salary of approximately $80,000. (ECF No. 22-8 ¶ 9).

**B.   Procedural Background**

Plaintiff filed a charge of discrimination with the EEOC on or about June 1, 2009. In that complaint, he alleged that he had suffered discrimination on the basis of race and national origin and that he had faced retaliation "for engaging in protected activity." (ECF No. 22-4, at 3). The EEOC mailed

---

[3] Plaintiff alleges that Dr. Holden once told him that he could end his employment with UMES if Plaintiff did not agree with Dr. Holden's personnel decisions. (*Id.* at 13). Plaintiff's sworn declaration does not specify when Dr. Holden made this statement.

Plaintiff a right-to-sue letter on July 9, 2009.  (ECF No. 22-5).

Plaintiff filed a complaint in this court on October 2, 2009, naming UMES, Dr. Holden, and Mr. Bivens as Defendants (ECF No. 1).  In the complaint, Plaintiff alleges discrimination on the basis of race, color, and national origin as well as retaliation, in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e *et seq.*, and 42 U.S.C. § 1981, and violations of the Equal Pay Act of 1963 ("Equal Pay Act"), 29 U.S.C. § 206(d).  (ECF No. 1).[4]  Defendants answered the complaint (ECF No. 4), and a scheduling order was issued on October 30, 2009 (ECF No. 5).  Defendants filed the pending motion for summary judgment on March 24, 2011 (ECF No. 22), which Plaintiff has not opposed.

A court may enter summary judgment only if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.  *See* Fed.R.Civ.P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986);

---

[4] Plaintiff did not allege color discrimination in the charge of discrimination that he filed with the EEOC. Therefore, that allegation will not be considered in resolving the present motion. *See Bryant v. Bell Atlantic Maryland, Inc.*, 288 F.3d 124, 132-33 (4th Cir. 2002) (declining to consider the merits of a plaintiff's color discrimination claim when he alleged only race discrimination in his administrative complaint to the EEOC).

*Emmett v. Johnson*, 532 F.3d 291, 297 (4th Cir. 2008).   Summary judgment is inappropriate if any material factual issue "may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986); *JKC Holding Co. LLC v. Wash. Sports Ventures, Inc.*, 264 F.3d 459, 465 (4th Cir. 2001).   Plaintiff's lack of opposition means that Defendants' arguments remain uncontested, and the court must assume that Defendants' characterization of the complaint is correct.

## II.  Analysis

Defendants present a series of arguments in their unopposed motion for summary judgment:  (1) that the Eleventh Amendment to the United States Constitution bars all of Plaintiff's claims against UMES; (2) that Plaintiff's claims for failure to promote and retaliation are time-barred, and, to the extent that they are not time-barred, that Plaintiff fails to state a claim for which relief can be granted and/or qualified immunity protects Dr. Holden and Mr. Bivens from suit;[5] and (3) that the Equal Pay

---

[5] It is unclear whether Dr. Holden and Mr. Bivens raise qualified immunity only as a defense to Plaintiff's claims under § 1981 or whether they intend to raise that defense as to Plaintiff's Title VII claims as well.  Because the pending motion is decided on other grounds, the scope of the individual defendants' qualified immunity argument need not be reached.  To the extent, however, that they intended to raise this defense as to Plaintiff's claims under Title VII, that effort would have failed.  "[T]here is no qualified immunity from liability under

Act claim is time-barred, and, to the extent it is not time-barred, that Plaintiff fails to state a claim for which relief can be granted.  These arguments will be addressed in turn.

   **A.   Eleventh Amendment Immunity**

   Defendants contend that the Eleventh Amendment bars all of Plaintiff's claims against UMES.  The Eleventh Amendment provides that "[t]he Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State."  U.S. Const. amend. XI.  Although the literal terms of the Eleventh Amendment do not reference suits by citizens against their own state, the Supreme Court of the United States has long construed the Amendment to prevent citizens from bringing such suits in federal court unless the state has waived its sovereign immunity.  *Atascadero State Hosp. v. Scanlon*, 473 U.S. 234, 238 (1985) (citing *Hans v. Louisiana*, 134 U.S. 1 (1890)), *overruled on other grounds by statute*, 42 U.S.C. § 2000d-7.  It is well-established that the immunity afforded by the Eleventh Amendment extends to state agencies, including the University System of Maryland, and that the State

---

Title VII."  *Cutts v. Peed*, 17 F.App'x 132, at *3 (4th Cir. 2001).

of Maryland has not waived its immunity. *Palotai v. Univ. of Md. College Park*, 959 F.Supp. 714, 716 (D.Md. 1997); *Bishop v. Lewis*, No. WMN-10-3640, 2011 WL 1704755, at *2 (D.Md. May 4, 2011).[6]

Even where states have not waived their immunity to suit in federal court, Congress may abrogate this immunity by enacting legislation pursuant to its authority under the Fourteenth Amendment that permits federal courts to hear certain types of claims against states. *Middlebrooks v. Univ. of Md. College Park*, 980 F.Supp. 824, (D.Md. 1997) (citing *Fitzpatrick v. Bitzer*, 427 U.S. 445, 452-56 (1976)). It has done so in regard to claims under both Title VII and the Equal Pay Act. *Fitzpatrick*, 427 U.S. at 453, 457 (abrogating immunity under Title VII); *Usery v. Charleston Cnty. Sch. Dist.*, 558 F.2d 1169, 1171-72 (4th Cir. 1977) (abrogating immunity under the Equal Pay Act). Congress has not, however, abrogated this immunity with regard to claims under § 1981. *See Middlebrooks*, 980 F.Supp. at 828 ("Plaintiff's [§ 1981 claims] against the University, both for equitable and monetary relief, are barred by the Eleventh Amendment."). Thus, only Plaintiff's § 1981 claims against UMES are barred by the Eleventh Amendment.

---

[6] UMES is part of the University System of Maryland.  Md. Code Ann., Educ., § 12-101(5)(iv).

11

**B.   Title VII**

Plaintiff brings two claims against Defendants pursuant to Title VII:   (1) failure to promote and (2) retaliation.   At the outset, these claims cannot proceed against Dr. Holden and Mr. Bivens because Plaintiff's claims against these defendants are in their personal capacities, and Title VII, which applies only to employers, "foreclose[s] individual liability." *Lissau v. S. Food Serv., Inc.*, 159 F.3d 177, 180-81 (4th Cir. 1998).   As to Plaintiff's remaining Title VII claims, UMES maintains that the claims are time-barred and, to the extent that they are not, Plaintiff fails to state a claim for relief.

**1.   Timeliness of Plaintiff's Title VII Claims**

"Timeliness requirements for an action alleging employment discrimination are to be strictly enforced." *Tangires v. Johns Hopkins Hosp.*, 79 F.Supp.2d 587, 597 (D.Md. 2000).   UMES appears to base its timeliness argument on two grounds: (1) the time that passed between EEOC's mailing of Plaintiff's right-to-sue letter and the filing of Plaintiff's complaint in federal court; and (2) the time that passed between Plaintiff's resignation and the filing of his complaint with the EEOC.

The appropriate date from which to measure the beginning of the ninety-day period is the date that Plaintiff received the right-to-sue letter, not the date that it was mailed. *Roberson v. Bowie State Univ.*, 899 F.Supp. 235, 238 n.2 (D.Md. 1995). Here, the record indicates only that the EEOC mailed the letter on July 9, 2009. Only eighty-five days passed between July 9, 2009, when the EEOC mailed the right-to-sue letter, and October 2, 2009, the date Plaintiff filed his complaint in federal court. And, by definition, fewer days must have elapsed between the date that Plaintiff received the letter and the date that he subsequently filed the present action. Plaintiff thus commenced this action within the ninety-day period mandated by Title VII. *See* 42 U.S.C. § 2000e-5(f)(1).

UMES's argument regarding the timeliness of Plaintiff's EEOC complaint is more persuasive. Generally, claimants under Title VII must file a charge of discrimination within 180 days of the alleged discriminatory practice. *See Jones v. Calvert Grp., Ltd.*, 551 F.3d 297, 300 (4th Cir. 2009). But a "300-day period, rather than the 180-day period, applies where, as here, state law also proscribes the alleged employment discrimination and the plaintiff files with a state or local employment discrimination agency either before filing with the EEOC, or concurrently therewith." *White v. BFI Waste Servs., LLC*, 375

F.3d 288, 292 (4th Cir. 2004).   Put differently, claimants in a "deferral state" such as Maryland have 300 days to file their Title VII claims with the EEOC.   *See Valderrama v. Honeywell Tech. Solutions, Inc.*, 473 F.Supp.2d 658, 662 (D.Md. 2007).

In this case, Plaintiff filed his charge of discrimination with the EEOC between June 1 and June 3, 2009, and UMES received notification of this charge on June 29, 2009.   (ECF No. 22-4).[7] UMES maintains that the appropriate date from which to measure the 300-day window is June 29, 2009, but this argument misstates the law, which requires only that a plaintiff *file* his charge of discrimination within 300 days of the allegedly discriminatory action.   Using June 1, 2009 as the filing date, however, does little to aid Plaintiff's case.   The date 300 days prior to June 1, 2009 was August 5, 2008, and Plaintiff's complaint alleges only one incident that occurred after this date - a dispute with Mr. Bivens regarding the test report for the new transformer. Allegations related to incidents occurring prior to that date

---

[7] Plaintiff listed June 1, 2009 as the date on his charge of discrimination, while the date of the file-stamp appears to be June 3, 2009.   This potential discrepancy is of no moment because the two-day difference does not impact the incidents to be considered in evaluating Plaintiff's Title VII claims.   The court accepts June 1, 2009 as the filing date.

are therefore time-barred, and only this single incident may be considered in evaluating Plaintiff's Title VII claims.[8]

## 2.   Failure to Promote

Plaintiff alleges that UMES unlawfully discriminated against him on the basis of race and national origin by failing to promote him.   There are two methods for proving intentional discrimination in employment: (1) through direct evidence of intentional discrimination, or (2) through circumstantial evidence under the burden-shifting scheme set forth by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-05 (1973).   Plaintiff has produced no direct evidence of discriminatory failure to promote.   Therefore, he must proceed under the *McDonnell Douglas* burden-shifting framework.   Only if Plaintiff sets forth a *prima facie* case does the burden shift to

_____

[8] Incidents that occurred before August 5, 2008 could be considered if they related to an event occurring on or after August 5, 2008, as a "series of separate but related acts amounting to a continuing violation." *Beall v. Abbott Labs.*, 130 F.3d 614, 620 (4th Cir. 1997) (internal quotation marks omitted), *overruled on other grounds by Nat'l R.R. Passenger Corp v. Morgan*, 536 U.S. 101 (2002).   Before invoking the theory of continuing violations, however, the plaintiff must demonstrate that there is a present violation, *i.e.*, an actual violation occurring within the requisite time period – here, on or after August 5, 2008.   *Tinsley v. First Union Nat'l Bank*, 155 F.3d 435 (4th Cir. 1998), *overruled on other grounds by Nat'l R.R. Passenger Corp*, 536 U.S. 101; *Hill v. AT&T Techs., Inc.*, 731 F.2d 175, 180 (4th Cir. 1984).   There is no basis for doing so in the present action.

UMES to articulate a legitimate, non-discriminatory reason for its actions. *Id.* at 802. To establish a *prima facie* case for failure to promote, Plaintiff must show (1) that he applied for a position, (2) that he was qualified for that position, and (3) that he was denied the position under circumstances giving rise to an inference of discrimination. *See Anderson v. Westinghouse Savannah River Co.*, 406 F.3d 248, 268 (4th Cir. 2005).

Plaintiff fails to allege that he applied for any position after August 5, 2008. Indeed, the latest incident in which Plaintiff alleges failure to promote occurred in June 2008 when Dr. Holden promoted Mr. Bivens to be the Director of Physical Plant. Because Plaintiff does not allege that he applied for an available position during the appropriate time period, his failure to promote claim under Title VII must fail.

### 3.   Retaliation

Plaintiff additionally alleges that UMES unlawfully retaliated against him in violation of Title VII. To establish a *prima facie* claim for retaliation, Plaintiff must demonstrate (1) that he engaged in protected activity, (2) that he suffered a materially adverse employment action, and (3) that a sufficient causal connection exists between the protected activity and the materially adverse action. *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006); *Bryant v.*

*Aiken Reg'l Med. Ctrs., Inc.*, 333 F.3d 536, 543 (4th Cir. 2003).

UMES asserts that any claim for retaliation must fail as a

matter of law because the only protected activity in which

Plaintiff engaged - the filing of a charge of discrimination

with the EEOC - did not occur until after Plaintiff had

voluntarily resigned from UMES.  Plaintiff, in failing to oppose

the motion for summary judgment, has not contested this

characterization of his retaliation claim.

Plaintiff did engage in protected activity when he filed

his administrative complaint with the EEOC.  *See Price v.

Thompson*, 380 F.3d 209, 212 (4th Cir. 2004) (finding that a

plaintiff had satisfied the first element of a *prima facie* claim

for retaliation because the "EEO complaint is protected

activity").  He did so, however, more than ten months after he

voluntarily resigned his UMES employment.  The retaliatory

conduct alleged by Plaintiff, such as failure to promote, thus

occurred *before* Plaintiff engaged in protected activity.

Plaintiff's retaliation claim must therefore fail because he

cannot demonstrate a causal connection between his

administrative complaint and any adverse employment action that

he allegedly suffered.  *See Gibson v. Old Town Trolley Tours of

Wash., D.C.*, 160 F.3d 177, 181 (4th Cir. 1998) (reversing a

judgment in a plaintiff's favor when the alleged retaliation

17

"fatally" occurred before the plaintiff filed his grievance with the EEOC).[9]

### C.   § 1981

Plaintiff also brings his failure-to-promote claim under § 1981.  Dr. Holden and Mr. Bivens begin attacking this claim by contending that no contractual relationship existed between Plaintiff - apparently an at-will employee - and UMES, thereby preventing Plaintiff from asserting any claim under § 1981.  The Fourth Circuit, however, has repeatedly rejected this argument, holding that "an at-will employment relationship is contractual and may serve as a predicate contract for a § 1981 claim." *Hawkins v. PepsiCo, Inc.*, 203 F.3d 274, 278 (4th Cir. 2000) (citing *Spriggs v. Diamond Auto Glass*, 165 F.3d 1015, 1018-19 (4th Cir. 1999)).

--------

[9] The elements of a *prima facie* claim for retaliation under Title VII and § 1981 are identical.  *Pulley v. KPMG Consulting*, 348 F.Supp.2d 388, 396 (D.Md. 2004) (setting forth the elements of a § 1981 retaliation claim using a case from the United States Court of Appeals for the Fourth Circuit that had applied those same elements in the context of a Title VII retaliation claim).  Because Plaintiff fails to set forth a *prima facie* claim for retaliation under Title VII, his retaliation claim under § 1981 must similarly fail.  For this reason, the discussion of § 1981 below will consider only Plaintiff's failure-to-promote claim.

Although Plaintiff's § 1981 claim survives Defendants' initial argument, it fails on other grounds. Plaintiff's complaint states that the discrimination underlying his failure-to-promote claim was both race-based ("Black" or "African") and national-origin-based ("Nigerian"). (ECF No. 1). Section 1981 prohibits discrimination on the basis of race, but it "does not bar discrimination purely on the basis of national origin." *Schouten v. CSX Transp., Inc.*, 58 F.Supp.2d 614, 617 (E.D.Pa. 1999) (citing *Bennun v. Rutgers State Univ.*, 941 F.2d 154, 172 (3$^d$ Cir. 1991). Although this proposition may appear straightforward at first glance, the Supreme Court has construed "race" broadly for purposes of § 1981, concluding that when Congress enacted the statute, it "intended to protect from discrimination identifiable classes of persons who are subjected to intentional discrimination solely because of their ancestry or ethnic characteristics," even though § 1981 does not protect against discrimination on the basis of national origin. *St. Francis College v. Al-Khazraji*, 481 U.S. 604, 613 (1987).

In *St. Francis College*, the Court evaluated whether a plaintiff could sustain a § 1981 claim for race discrimination given that he had allegedly faced discrimination from a Caucasian supervisor due to his Arabian ancestry, rather than his Iraqi origin. *Id.* at 604. Reasoning that § 1981, at a

19

minimum, reached "discrimination directed against an individual because he . . . is genetically part of an ethnically and physiognomically distinctive sub-grouping of homo sapiens," the Court undertook an in-depth analysis of race as it was understood at the time of § 1981's passage in 1866.  *Id.* at 607. After examining the legislative history of § 1981, and considering numerous other sources, the Court concluded that persons of Arabian ancestry, while present-day Caucasians, were not considered to be of the same race as other Caucasians in 1866.  *Id.* at 610.   The plaintiff's § 1981 claim could therefore proceed.   In concurrence, Justice Brennan acknowledged that drawing the line between "discrimination based on ancestry or ethnic characteristics" and "discrimination based on place or nation of . . . origin" could be difficult, but he emphasized that "discrimination based on *birthplace alone* is insufficient to state a claim under § 1981."   (*Id.* at 614 (Brennan, J., concurring) (emphasis in original) (internal quotation marks omitted)).

Lower courts have since grappled with this elusive distinction, struggling to determine whether a plaintiff's invocation of his "place or nation . . . of origin" creates a § 1981 claim for racial discrimination and requires a similarly expansive historical analysis.   Two guiding principles have

emerged from these decisions.  First, the plaintiff must prove
that he actually faced intentional discrimination based on his
ancestry or ethnic characteristics, rather than solely on his
place of origin, in order to invoke the broad construction of
race under § 1981.  *Nagy v. Balt. Life Ins. Co.*, 49 F.Supp.2d
822, 831-32 (D.Md. 1999), *vacated in part on other grounds*, 215
F.3d 1320 (4th Cir. 2000) (unpublished table opinion); *Saleh v.
Univ. of Va.*, No. Civ.A. 3:97-CV-460 R, 1999 WL 34798179, at *18
(E.D.Va. Feb. 25, 1999) (finding that a Nigerian plaintiff's
discrimination claim against African-American supervisors failed
to invoke the broad construction of race under § 1981 where the
"best evidence" of discrimination – statements about the
plaintiff's birthplace and accent – was "indicative only of
foreign-born/national origin discrimination"), *aff'd*, 11 F.App'x
241 (4th Cir. 2001).  Second, where a plaintiff's allegations
reference only his place of origin and do not focus on specific
ethnic characteristics associated with that place of origin, the
broad construction of race under § 1981 does not apply.  *Compare
Padron v. Wal-Mart Stores, Inc.*, --- F.Supp.2d ---, 2011 WL
1760229, at *10-11 (N.D.Ill. May 9, 2011) (considering § 1981's
legislative history and finding that plaintiffs of Cuban origin
could maintain a § 1981 claim stemming from interactions with
their Caucasian supervisors where the plaintiffs' complaint had

21

identified specific Cuban ethnic characteristics for which they faced discrimination), *with Jadali v. Alamance Reg'l Med. Ctr.*, 399 F.Supp.2d 675, 682 (M.D.N.C. 2005) (noting that a complaint's repeated references to being "foreign born" supported a conclusion that the plaintiff's discrimination claim related to his national origin, rather than his race).

Here, it is undisputed that Dr. Holden and Mr. Bivens are both African-American males, and that Plaintiff is a Nigerian-born male who has since become a naturalized American citizen. To the extent that Plaintiff's § 1981 claim for failure to promote derives from discrimination that he allegedly suffered because he is "Black" or "African," that claim fails at the first step because Plaintiff cannot set forth a *prima facie* case.[10]  If, however, Plaintiff bases his § 1981 claim on the

---

[10]  The standard for analyzing failure-to-promote claims under § 1981 is identical to that employed under Title VII. *See Causey v. Balog*, 929 F.Supp. 900, 913 (D.Md. 1996) (applying the same *prima facie* case for failure to promote under Title VII and § 1981).  Although Plaintiff's § 1981 claim encompasses incidents occurring between October 2, 2005, and August 18, 2008, a significantly greater time period than under his Title VII claims, those additional incidents fail to aid Plaintiff's case.  *See Jones v. R.R. Donnelley & Sons Co.*, 541 U.S. 369, 383-84 (2004) (noting that a four-year statute of limitations applies to § 1981 claims arising after formation of the contract on which the claim is based); *Williams v. Reliable Contracting Co.*, No. JKB-09-484, 2010 WL 1713995, at *7-8 (D.Md. Apr. 27, 2010) (same).

Plaintiff's complaint suggests that he requested promotion from interim to permanent Assistant Director of Physical Plant

broad construction of race, in essence contending that he suffered racial discrimination due to his Nigerian ancestry or ethnicity – which Dr. Holden and Mr. Bivens do not appear to share – the claim would require additional analysis.

There is no evidence in the record that this broad construction of race should apply in the present case. First, Plaintiff's "best evidence" of discrimination, *i.e.*, two statements made by Mr. Bivens in June 2008, fails to demonstrate any animus related to Plaintiff's Nigerian ethnicity (as opposed to his Nigerian origin). Plaintiff alleges that Mr. Bivens came to his worksite on one occasion, described himself as the "Biblical Pharaoh ordering the Israelites to make bricks with no straw," and told Plaintiff "one down and one more to go," an apparent reference to Dr. Ngwaba's transfer from the position of

from 2005 to 2008 and from this interim position to Director of Physical Plant in 2008. These incidents, however, fail to give rise to an inference of racial discrimination. Indeed, Plaintiff alleges that Mr. Bivens and Dr. Ngwaba, members of the same race, received promotions around this time. *See Cutshall v. Potter*, 347 F.Supp.2d 228, 237 (W.D.N.C. 2004) (granting an employer's motion for summary judgment on a failure-to-promote claim where the employer had offered promotions to members of the same race as the plaintiff, thereby "creat[ing] a 'powerful inference'" that the failure to promote the plaintiff "was not motivated by race discrimination" (quoting *Proud v. Stone*, 945 F.2d 796, 798 (4th Cir. 1991))); *Sonpon v. Grafton Sch.*, 181 F.Supp.2d 494, 500 (D.Md. 2002) ("[C]ourts have held that a plaintiff did not [set forth a claim for failure to promote] where applicants of the same race . . . as the plaintiff filled the positions for which he had applied.").

Director of Physical Plant.  (*Id.* § 39).  The first statement
appears only to be a colorful description of Mr. Bivens's
decision that Plaintiff could no longer employ other UMES
personnel to repair the deficiencies identified during the
thermal scan.  Although the second statement, which references
Dr. Ngwaba's transfer, could potentially be construed to evince
some discriminatory animus, that animus most plausibly relates
to Plaintiff's national origin, as Dr. Ngwaba and Plaintiff are
both from Nigeria.

Second, while Plaintiff mentions that he is from Nigeria in
his complaint, he never references any ethnic characteristics
associated with his Nigerian origin to suggest that application
of the broad definition of race is appropriate in the present
case.  On the whole, there is simply "an absence of evidence
pertaining to racial animus" resulting from Plaintiff's Nigerian
ethnicity.  *Saleh*, 1999 WL 34798179, at *18.  Thus, to the
extent that Plaintiff seeks to base his § 1981 claim on racial
discrimination that he faced because of his Nigerian origin,
that claim must also fail, and there is no need to reach the
Defendants' remaining arguments regarding § 1981.  *See id.*
(holding that a Nigerian plaintiff's § 1981 claims against his
African-American supervisors could not proceed); *Shinwari v.
Raytheon Aircraft Co.*, 25 F.Supp.2d 1206, 1209-10 (D.Kan. 1998)

(concluding that a plaintiff's § 1981 retaliation claim could not proceed on the basis of national origin).

### D.    Equal Pay Act

Defendants' final arguments address Plaintiff's claim under the Equal Pay Act.  Specifically, Defendants contend that the incidents alleged in that claim are time-barred and that, even if they are not, Plaintiff fails to state a claim upon which relief could be granted.  There is no need to address the former argument because the latter is dispositive in this case.

To establish a *prima facie* case under the Equal Pay Act, "the plaintiff bears the burden of showing that [he] (1) receives lower pay than a [female] co-employee (2) for performing work substantially equal in skill, effort, and responsibility under similar working conditions." *Strag v. Bd. of Trs., Craven Cmty. College*, 55 F.3d 943, 948 (4th Cir. 1995). In his complaint, however, Plaintiff fails to mention even a single female co-employee who earned a higher salary than Plaintiff during his 18-year employment at UMES.  Indeed, Plaintiff's Equal Pay argument focuses solely on the pay disparity between his salary and the salaries of his male colleagues, and his complaint expressly states that the discrimination he allegedly suffered arose due to his race and national origin.  Because the Equal Pay Act targets only gender-

25

based   compensation   discrimination,   *Diamond   v.   T.   Rowe   Price Assocs.*, 852 F.Supp. 372, 389 (D.Md. 1994), and Plaintiff makes no allegation related to gender discrimination in his complaint, his claim under the Equal Pay Act must fail.

## III.  Conclusion

For the foregoing reasons, Defendants' motion for summary judgment will be granted.  A separate Order will follow.

_____/s/_____
DEBORAH K. CHASANOW
United States District Judge
